UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LESAMUEL PALMER,

                    Plaintiff,

vs.                            Case No.  2:09-cv-604-FtM-29DNF

A. JOHNSON; A. WALKER; M. KRAUS; S.
CONIGILIO,

                    Defendants.

_____

### OPINION AND ORDER

#### I.  Status

    This matter comes before the Court upon review of Defendant Johnson's Motion for Summary Judgment (Doc. #112, Johnson Motion) and supporting exhibits including inter alia: use of force checklists and worksheets; disciplinary reports written about Plaintiff; inmate grievances submitted from Plaintiff and responses thereto; incident reports related to the use of force; use of force forms completed by correctional officers; and, excerpts from Plaintiff's deposition.  See generally Doc. #112-1, Johnson Exhs. A-J.

    Plaintiff, through counsel, files a Response in opposition (Doc. #114, Response Johnson) to the Motion and attaches supporting exhibits, some of which duplicate the Defendant's exhibits.  See Doc. #114-1-114-3, Pl's Exhs. A-H.  These exhibits include inter alia incident reports; use of force forms; inmate grievance summary form; inmate grievances and responses thereto; Inspector General's

Investigations Log; Declaration of Ron McAndrew; Declaration of Andro Johnson; and, portions of the transcript of Plaintiff's deposition testimony.

The Court also reviews Defendants Kraus, Coniglio, and Walker "Amended Motion for Summary Judgment"[1] (Doc. #113, Officers' Motion) and supporting exhibits including the fixed-wing video footage that captured the use of force incident, but does not convey spoken words; handheld video recording that captured the post use of force incident and conveys spoken words; use of force checklist forms; report of force used forms; medical notes; incident reports; inmate disciplinary action forms regarding Plaintiff; Affidavit of Michael Kraus; Affidavit of Aaron Walker; Bureau of State Investigations Case Summary report; Expert Witness Report from James Upchurch; and, portions of the transcript of Plaintiff's deposition testimony. Doc. #113-1, Officers' Exhs. A-N. Plaintiff, through counsel, files a Response in opposition (Doc. #115, Response) and attaches supporting exhibits (Doc. #116), all of which are already listed above.

---

[1]This is Defendant Coniglio's first Motion for Summary Judgment and Defendants Kraus and Walker's Amended Motion for Summary Judgment. See docket. Plaintiff takes issue with the fact that Defendants were permitted to re-file Motions for Summary Judgment. The Court permitted Defendants to do so because the initial Motion for Summary Judgment filed on behalf of Defendants Kraus and Walker was filed before the Court entered a Case Management and Scheduling Order and therefore before the parties were able to engage in discovery. Significantly, Plaintiff's deposition occurred on May 19, 2011, well after the Defendants' initial Motions for Summary Judgment were filed.

## II. Background

LeSamuel Palmer, an inmate in the custody of the Florida Department of Corrections, initiated this action by filing a pro se Civil Rights Complaint (Doc. #1, Complaint) pursuant to 42 U.S.C. § 1983 on September 14, 2009. After granting Plaintiff several extensions of time to file pro se responses to the Defendant Johnson's Motion to Dismiss, and Defendants Kraus and Congilio's pre-discovery Motion for Summary Judgment, the Court entered Orders on January 28 and 28, 2011, granting in part and denying in part Defendant Johnson's Motion to Dismiss (Doc. #82) and granting in part and denying in part Defendants Kraus and Walker's pre-discovery Motion for Summary Judgment (Doc. #83). Thereafter, on February 1, 2011, the Court entered a Case Management and Scheduling Order setting the deadline for discovery and dispositive motions (Doc. #86). On February 23, 2011, counsel entered his appearance on behalf of Plaintiff and was granted an extension of time to effect service of process on Defendant Coniglio.[2] Service of process was effected on Defendant Congilio. See Doc. #107.

_____

[2]Once counsel entered an appearance for Plaintiff, the track of the case was changed from a Track One to a Track Two case. Pursuant to the Local Rule 3.05 (M.D. Fla. 2009), in a Track Two case, counsel is required to submit a proposed Case Management and Scheduling Report. Counsel submitted their Joint Case Management Report on July 13, 2011.

Plaintiff is proceeding in this action against the following Defendants in their individual and official capacities: Andro Johnson, the Warden of Charlotte Correctional Institution at the time of the incident; A. Walker, a Lieutenant at Charlotte Correctional Institution at the time of the incident; and M. Kraus and S. Coniglio, correctional officers at Charlotte Correctional Institution the time of the incident. Complaint at 6-7. Because Plaintiff named the Defendants in their official capacities, the Court previously liberally construed the claim to also be against the Secretary of the Florida Department of Corrections. See Doc. #79 at 4 (citing Doc. #32 at 3, 5). Plaintiff alleges he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff's claims stem from an alleged excessive use of force that occurred during his escort from recreation to his cell on June 9, 2009[3] at Charlotte Correctional Institution ("CCI"). Complaint at 8.

Plaintiff seeks the following as relief: an injunction prohibiting the Department of Corrections from confining him in

---

[3]The Complaint alleges the incident took place on June 8, 2009. Complaint at 8-9. Defendants note that no use of force occurred on June 8, but a use of force incident somewhat similar to Plaintiff's allegations occurred on June 9, 2009. Officers Motion at 2, fn. 1. Although Plaintiff does not stipulate in his Response to the date the incident occurred, Plaintiff also refers to the incident as occurring on June 9 in his Response. Because the record before the Court conclusively shows that the incident occurred on June 9, 2009, and no reasonable juror could conclude the incident occurred on June 8, 2009, the Court concludes that the use of force at issue occurred on June 9, 2009.

close management, compensatory damages in the amount of $80,000.00 against each Defendant, and punitive damages in the amount of $60,000 against each Defendant.  Complaint at 12.

### III. Facts

**A.  Undisputed Facts**

The record sets forth the following undisputed facts, which are construed in the light most favorable to the Plaintiff.  The Department of Corrections has classified Plaintiff as a "close management" inmate since 2005.  Prior to the instant action, prison officials at Florida State Prison, Union Correctional Institution, R.M.C. Main Unit, and CCI have found Plaintiff guilty of various disciplinary infractions for violating Department rules, including, but not limited to: breaking another inmate's arm, fighting, unarmed assault, possession of a weapon, and spoken threats.  See Doc. #113, Pl's Depo. Exh. J at p. 38, Disciplinary Report, Exh. B; Disciplinary Actions Form, Exh. C; see also Doc. #116, Pl's Exh. F, Pl's Depo, p. 38.  Plaintiff is considered a "writ writer," meaning he writes a lot of inmate grievances, but he also has grievances submitted about him.  See generally Doc. #112-1, Exhs. C, D;  Exh. D at 51 (inmate John Doe reporting that Plaintiff told him he was the leader of a black gang mob and was planning an escape); Exh. D at 57 (reporting Plaintiff's use of profanity against Officer Schwartz and threatening the Officer, stating "I'm gonna get a hold

of you and kill you," "wish this window wasn't here.  I'm going to have your job."); Doc. #114-1, Exhs. C, D1-D17.

On June 9, 2009, around 9:10 a.m., Lieutenant Walker came to "counsel" Plaintiff at his recreation cage.  Doc. #116, Pl's Depo. at 16; Officers' Mot. at 2; see generally Response; Doc. #116, Pl's Exh. A, Incident Report; Pl's Exh. B, Incident Report.  Officers Kraus and Coniglio were present at Plaintiff's recreation cage to escort Plaintiff, who was in hand restraints,[4] from his recreation cage to his cell.  Officers' Mot. at 2; see generally Response; Doc. #116, Pl's Exh. A, Incident Report;  Pl's Exh. B, Incident Report.  Plaintiff objected to be escorted by Officer Kraus and asked Lieutenant Walker if another officer could escort him.  Pl's Response at 8 (citing Pl's Depo. At 12-14).  Officer Walker denied Plaintiff's request for a different escort and warned him that failure to comply with the guards' orders would result in the use of force.  Id.  Officer Kraus was the primary officer who escorted Plaintiff by holding his arm.  See Video I.  The escort did not go without incident.  Id.

During the escort, Plaintiff admits that he was "agitated," that he "turned" his head, was "face-to-face" with Officer Kraus, and that he "does not recall" whether or not he used profanity toward Kraus.  Response at 7; Doc. #116, Pl's Depo., Exh. F at 21-

_____

[4]Plaintiff is a front cuff inmate.  Thus, Plaintiff was not cuffed behind his back, but in front.

23.   The video footage confirms that the escort halted for approximately four seconds, when Plaintiff was "face-to-face" with Kraus, at which point Officer Kraus used two, swift, spontaneous movements to take Plaintiff to the ground.  Doc. #113-1, Aff. Kraus at 2; Aff. Walker at 1-2; Exh. D, Incident Report at 39, 41; Pl's Video; Defs' Video, Part I.  The video shows Plaintiff landed on his side on the ground and Kraus was also on the ground struggling to turn Plaintiff, who was resisting, chest down on the floor.  Id. Once Plaintiff was on the ground, Officer Coniglio assisted Kraus secure Plaintiff on the ground by holding his legs, and placing leg irons on Plaintiff.  Doc. #113-1, Aff. Kraus at 2; Aff. Walker at 1-2; Pl's Video; Defs' Video.  Lieutenant Walker was present at the scene, but did not get involved in the physical restraint of Plaintiff on the ground.  Pl's Video; Defs' Video; Doc. #113-1, Aff. Walker at 1-2; Doc. #116, Pl's Depo. at 15-16.  The duration of time, from the initial take down by Kraus to the time the officers lifted Plaintiff from the ground, spanned approximately four minutes.  See Pl's Video, 9:11:12-9:15:30.

Other correctional officers arrived and escorted Plaintiff to the medical department.  See Pl's Video; Defs' Video, Part I; Doc. #113-1, Exh. D at 50-52.  The handheld video conveys spoken words and captured Defendant Kraus asking Plaintiff whether he "is going to cause any more [trouble]."  See Defs' Video, Handheld. Plaintiff responded "all I want is to be escorted by another

officer." <u>Id.</u>   This video also reveals Plaintiff verbally bantering with the correctional officers.  <u>Id.</u> (repeatedly stating to the camera that he wants "it to be known that [the incident] was done in retaliation.").   The video confirms that Plaintiff was escorted directly to the medical department.  <u>Id.</u>; Doc. #133-1, Officers' Exh. D at 47, 50-52.  The medical forms evidence that Plaintiff sustained only "superficial scrapes" to both elbows and a scratch to his right forearm, which were treated with band-aids. Doc. #113-1, Exh. D at 42-43.  Plaintiff also complained of back pain during the post use of force examination, but acknowledges that he suffers from a pre-existing back condition.  <u>Id.</u>; <u>see also</u> Officers' Exh. I; Response at 9 (citing Pl's Depo. 32-34).

**B.  Disputed Facts**

 The parties dispute facts concerning the relationship between Defendant Kraus and Plaintiff in the months leading up to the June 9 incident, Plaintiff's behavior immediately proceeding the June 9 incident, the reason why Defendant Kraus used force on Plaintiff, and whether Kraus hit Plaintiff and called him a "baby raper," while securing Plaintiff on the ground.  The Court finds that not all of these facts are material to the issue before the Court.

Plaintiff contends that Defendant Kraus always "picked on" him, but never threatened him with physical harm.  <u>See generally</u> Doc. #116, Pl's Depo. at 10-11.  Plaintiff specifically references a prior incident that occurred on February 3, 2009, when Defendant

Kraus applied chemical agents on Plaintiff and his cellmate for fighting.  Response at 3; Doc. #116, Exh. D-2-D-7.  Plaintiff contends that he and his cellmate were merely "exchanging words," not fighting.  See Id.  Defendants contend that Plaintiff was found guilty of a disciplinary infraction for fighting on February 2, 2009.  Officers' Motion at 2; Exh. A at 6-7; Exh. B.  Further, upon investigation by the Inspector General's Office, Kraus' use of chemical agents on February 2, 2009 was deemed appropriate.  Response at 2;  Exh. A at 6.

Also disputed is the events that prompted Plaintiff's escort from recreation.  Defendants state that Plaintiff was creating a disturbance by yelling outside in his recreation cage, thereby necessitating Lieutenant Walker's presence and counseling before Plaintiff was escorted back to his cell.  Officers' Mot. at 2.  Plaintiff disputes that he was creating a disturbance by yelling at recreation and claims Kraus lied.  Response at 8 (citing Pl's Depo. 18-19).

During the escort, Defendants submit that Plaintiff "pulled away" from Kraus.  Id.  Kraus explains that when he attempted to lead Plaintiff away from the recreation cage, Plaintiff refused to move.  Thus, it was Kraus' subjective experience that Plaintiff was "pulling away."[5]  Defendants state that the video then shows

---

[5]Defendants' explanation about what Kraus really intended by the statement that Plaintiff was "pulling away" is not inconsistent
(continued...)

Plaintiff being ordered to walk, to which, after a couple orders, he complies.  Id., fn. 2; see also Doc. #113-1, Officers' Exhs. D, E, F.  The video does indeed show Kraus, Coniglio, and Walker standing at the recreation cage door with Plaintiff in the door frame of the cell.  Pl's Video at 9:10:58.  Coniglio steps back from Kraus and Plaintiff.  Id.  Plaintiff has not yet left his cell and Kraus raises his right arm extending it up and pointing, as if he is directing Plaintiff to come out of his cell and start walking.  See id. at approximately 9:10:57.  Kraus lowers his arm and makes this same movement a second time, as if to direct Plaintiff out of the cell door.  Id. at 9:10:59.  Plaintiff disputes that he "pulled away" from Kraus during the escort, but acknowledges that he was "agitated" during the escort.  Pl's Depo., Doc. #116, Exh. F at 19, 23.  The video shows Plaintiff left his cell, escorted by Kraus, and walked toward a wall in the hallway, which was approximately a forty-five degree angle from the recreation cell door.  Pl's Video at 9:11:07.  Defendants submit that Plaintiff suddenly stopped, turned around, and faced Officer Kraus in an aggressive manner and began yelling obscenities at Kraus.  Officers' Motion at 3 (citing Exhs. D, E, F).  The video

---

[5](...continued)
with the Court's previous finding in its January 28, 2011 Order, which looked for "pulling away" once Kraus and Plaintiff had left the recreation cell and were walking.  Doc. #83 at 9.  Now Defendants clarify that Plaintiff "pulled away" before the escort even began, while Plaintiff was in the door frame to the recreation cell.

confirms that the escort comes to a halt near the wall and
Plaintiff faces Kraus, but the video does not convey spoken words.[6]
See Pl's Video at 9:11:08.   Due to Plaintiff's threatening stance,
disposition, and knowledge that even a handcuffed inmate can harm
an officer, Kraus submits that he immediately felt threatened, so
he forced Plaintiff to the ground.   Id.; see also Doc. #113-1, Aff.
Walker at 66 (explaining in seventeen year career with Department
of Corrections, handcuffed inmates can pose significant risk to
guards).   Plaintiff acknowledges that he turned his head during the
escort, but submits that he turned his head to respond to inmate
Clayton McGee and stated "I'm cool brother.  They can't get to me."
Response at 7; Doc. #116, Pl's Depo., Exh. F at 22.   Plaintiff's
answers to inmate McGee were in response to inmate McGee telling
Plaintiff to "just chill out."  Pl's Depo., Exh. F. at 17.   Neither
of Plaintiff's Responses to the instant Motions contain any
affidavit, declaration, grievance, or incident report from inmate
McGee.   See generally Pl's Exhs, Docs. #114-1, #116.   After turning
his head toward inmate McGee to respond, that is when Plaintiff
claims Kraus used force to drop Plaintiff to the concrete.   Id.

After Plaintiff was on the ground, Kraus maintained his left
forearm across Plaintiff's upper back and his right arm on

---

[6]The door leading into the institution is quite a distance away
from where the escort halted and take down occurred.  See Pl's
Video.   The distance is sufficient enough for other officers to
walk in and out of the door without any hindrance by Plaintiff
subdued on the ground by Officer Kraus.

Plaintiff's left shoulder.  Officers' Motion at 3 (citing Exhs. D, E, F); see also Pl's Video.  Defendant Coniglio assisted Kraus by placing his left hand on Plaintiff's back and right hand on Plaintiff's left leg in order to secure Plaintiff to the ground. Id.  Defendants submit that Kraus did not hit Plaintiff, or call Plaintiff any names.  Id.  Plaintiff alleges that while on the ground, Defendant Kraus hit him in the ribs and called him a "baby raper."  Plaintiff cannot describe how Kraus hit him, on what side he was hit, or how many times he was hit, and acknowledges he did not feel pain from the hits.[7]  Doc. #116, Pl's Depo., Exh. F at 25-

---

[7]Q. [Defense Counsel]  You state in your complaint that you received quote, blows, unquote, from Defendant Kraus after you were on the ground.  Explain what you mean by this.
        A.  [Plaintiff]  Kraus, when Officer Kraus was laying on my back and everything, like he was hitting me on the side and calling me a baby raper.
        Q.  Where did he hit you?
        A.  Like it was on my right side.
        Q.  In the ribs?
        A.  Yeah, close to the rib area.
        Q.  Did he hit you with his hand?
        A.  What you mean by did he hit me with his hand?
        Q.  Did he hit you with his hand, his foot, his head?  How did he hit you?
        A.  No, he didn't hit me with his foot. He didn't hit me with his head.  It's like his hand and everything he hit me with.  I actually don't know what he– I mean the way he hit me, balled fist or whatever like that, because I'm laying there on the ground in handcuffs in RIPP Restraints.  You know what I'm saying?
        Q.  Did he pull his hand back as he hit you?
        A.  I can't actually answer that, sir.  I really don't know about all that. . . . .
        Q.  How hard of a hit was it?
        A.  I can't actually answer how hard the hit is.
        Q.  You don't remember how hard he hit you?
        Mr. Cook Object to the form.

(continued...)

28.   Defendants submit that Plaintiff continued to resist until Coniglio placed leg irons on him.   Id.  The video captures the left side angle of Kraus and Coniglio securing Plaintiff to the ground. See Pl's Video at approximately 9:11:13.   From this vantage point, it is abundantly clear that Kraus' left arm remains planted across Plaintiff's shoulders in order to secure him to the ground. Although not a clear view, it does not appear that Kraus moves his right arm, which he would have had to move in order to punch, or hit, Plaintiff.  See Pl's Video.  Defendants submit that force was discontinued when Plaintiff ceased resisting the officers. Officers' Motion at 3 (citing Exhs D, E, F).

At approximately 9:18 a.m., Plaintiff was escorted to the medical department.  Id. (citing Exh. D at 9-10).  The handheld video with audio recorded the officers lifting Plaintiff from the ground to his feet, his escort to medical, and his medical

---

[7](...continued)
    A.  I don't know how hard he hit.  He got to tell you hard he hit.
    Q.  Well, how did it feel, sir?  When he hit you, how did it feel?
    A.  I don't– I don't feel pain like that, sir. I can't describe to you how it might have felt. . . .
    Q.  . . . Did you feel pain from the hit?
    A.  No, I felt the hit.  I felt the hit.
    Q.  I'm not asking you if you felt the hit.  I'm asking you if you felt pain from the hit.
    A.  I just said I don't feel pain.
    Q.  You didn't feel any pain?
    A.  Nuh-uh.

 Doc. #116, Pl's Depo. 25-27.

examination.  See Handheld Video.  The medical forms document that
Plaintiff complained of back pain, had scratched elbows, and had
one scratch on his forearm after the use of force.  Doc. #113-1,
Officers' Exh. D at 9-10.  Plaintiff produces no medical documents
showing that he complained of pain in his ribs, sought treatment
for any medical issues in his rib area, or that he subsequently had
any bruising in his rib area.

With respect to Defendant Lieutenant Walker, Plaintiff
attributes liability on the Lieutenant for failing to have someone
other than Kraus escort him.  Complaint at 9-10.  Plaintiff claims
that earlier in the day on June 9, 2009, he told Walker that he was
afraid of Kraus.  Response at 8 (citing Pl's Depo. at 12-14).
Plaintiff also claims that immediately before the escort commenced
he asked Lieutenant Walker to have someone other than Kraus escort
him, but Walker told him "no" and if he did not come along that
they would use force on him.  Id. (citing Pl's Depo. at 12-14).
Plaintiff also attributes liability on Walker for failing to
intervene when Kraus used force on him.  Id. at 9 (citing Pl's
Depo. at 22-30).  Lieutenant Walker submits that he did not see
either correctional officer take any action that he felt was
excessive.  Officers' Motion at 3-4 (citing Exh. F).  Officer
Walker saw no punches thrown and did not hear either officer call
Plaintiff a "baby raper."  Id. at 4.  Officer Walker asserts that

had he believed the force was unnecessary at any point, he would have stopped it.  Id. (citing Exh. F).

Plaintiff attributes liability on Defendant Warden Johnson for failing to exercise "reasonable care" based on his knowledge of the previous attack by these same officers in February.  Complaint at 10.  Plaintiff submits that he previously told Warden Johnson that he feared for his life and feared retaliation by Defendants Coniglio and Kraus, but his statements were ignored.  Id.  Warden Johnson disputes that he had any knowledge of Plaintiff being in any danger from Officers Kraus and Coniglio.  Johnson Motion at 3.  Defendant Johnson acknowledges that Plaintiff filed grievances against Officer Kraus and Coniglio, but his subordinates reviewed and handled these grievances.  Johnson Motion at 3.  After numerous levels of review, Defendant Johnson reports that Plaintiff's allegations in the grievances were unsubstantiated.  Johnson Motion at 4 (citing Johnson Exhs. at A, C, D, E, F, G).  Thus, Defendant Johnson submits that he never received any records verifying any of the Plaintiff's claims.  Id. at 4.  Defendant Johnson submits that "if he had been given verifiable information, from any of the various levels of review, that Officers Kraus or Coniglio may have been a threat to Plaintiff, then he would have taken appropriate steps to ensure the safety and security of Plaintiff."  Id. at 3 (emphasis in original).

## IV. Applicable Law

### A.   Standard of Review

"Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)(internal quotations and citations omitted). See also, Fed. R. Civ. P. 56(c)(2).  "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." Moton, 631 F.3d at 1341 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The standard for creating a genuine dispute of fact requires the court to "make all *reasonable* inferences in favor of the party opposing summary judgment," Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc)(emphasis added), not to make all *possible* inferences in the non-moving party's favor.

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of persuasion" and must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." Beard v. Banks, 548 U.S. 521, 529 (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v.

Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).
If there is a conflict in the evidence, the non-moving party's
evidence is to be believed and "all justifiable inferences" must be
drawn in favor of the non-moving party.  Beard, 548 U.S. at 529
(citations omitted); Shotz v. City of Plantation, Fl., 344 F.3d
1161, 1164 (11th Cir. 2003).  "A court need not permit a case to go
to a jury, however, when the inferences that are drawn from the
evidence, and upon which the non-movant relies, are 'implausible.'"
Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th
Cir. 2002) (citations omitted).  Nor are conclusory allegations
based on subjective beliefs sufficient to create a genuine issue of
material fact.  Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217
(11th Cir. 2000).  "When opposing parties tell two different
stories, one of which is blatantly contradicted by the record, so
that no reasonable jury could believe it, a court should not adopt
that version of the facts for purposes of ruling on a motion for
summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

In cases where there is video evidence, the Court accepts the
video's depiction over the opposing party's account of the facts
where the video obviously contradicts the version of the facts.
Pourmoghani-Esfahni v. Gee, 625 F.3d 1313, 1315 (11th Cir.
2010)(per curiam)(quoting Scott v. Harris, 550 U.S. 372, 380
(2007)).  Even where the entire series of events is recorded,
video evidence is not obviously contradictory where it fails to

convey spoken words or tone, or fails to provide an unobstructed view of the events. Id.; see also Logan v. Smith, No. 11-10695, 2011 WL 3821222 (11th Cir. Aug. 29, 2011)(unpublished).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001). In addition, a plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. Marsh, 268 F.3d at 1059; Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994). A defendant who occupies a supervisory position may not be held liable under a theory of *respondeat superior* in a § 1983 action. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-692 (1978); Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003); Farrow v. West, 320 F.3d 1235 (11th Cir. 2003).

**B.  Eighth Amendment**

Liberally construing the Complaint, Plaintiff alleges violations of the Eighth Amendment under the United States Constitution. See generally Complaint. The Eighth Amendment, which applies to the states through the Fourteenth Amendment, can give rise claims challenging the excessive use of force. Thomas v.

Bryant, 614 F.3d 1288, 1305 (11th Cir. 2010)(reviewing categories of claims under the Eighth Amendment).  An excessive-force claim requires a two-prong showing: (1) an objective showing of deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities"; and, (2) a subjective showing that the official had a "sufficiently culpable state of mind."  Id. (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)(other citations omitted).  It is the "unnecessary and wanton infliction of pain" caused by force used "maliciously and sadistically" for the very purpose of causing harm that constitutes cruel and unusual punishment.  Whitley v. Albers, 475 U.S. 312, 322 (1986).   Thus, where an Eighth Amendment claim is based upon allegations of excessive force, the question turns on whether the prison guard's "force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm."  Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005).  To determine whether force was applied "maliciously and sadistically," courts consider the following factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations and citations omitted).  When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007)(citations omitted).  The courts examine the facts as reasonably perceived by Defendants on the basis of the facts known to them at the time.  Whitley v. Albers, 475 U.S. 312, 321 (1986).

Moreover, in the context of prison discipline, a distinction is made between "punishment after the fact and immediate coercive measures necessary to restore order or security." Ort v. White, 813 F.2d 318, 324-325 (11th Cir. 1987).  When a prison's internal safety is of concern, courts conduct a more deferential review of the prison officials' actions.  Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991)(citations omitted).  Indeed, "[t]hat deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches in prison discipline." Whitley, 475 U.S. at 322; see also Bell v. Wolfish, 441 U.S. 520, 547 (1979).

The failure to protect an inmate from violence can also give rise to an Eighth Amendment claim.  The Supreme Court made clear

that "prison officials have a duty . . . to protect prisoners from violence . . . . ." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection. <u>Hopkins v. Britton</u>, 742 F.2d 1308, 1310 (11th Cir. 1984).   Not every injury that an inmate suffers in prison "translates into a constitutional liability." <u>Farmer</u>, 511 U.S. at 834.   Rather, a prison official's deliberate indifference to a substantial risk of harm to an inmate offends "evolving standards of decency," and rises to a violation of the Eighth Amendment.   <u>Id.</u> at 828. "Deliberate indifference is not the same thing as negligence or carelessness." <u>Maldonado v. Snead</u>, 168 F. App'x 373 (11th Cir. 2006)(citing <u>Ray v. Foltz</u>, 370 F.3d 1079, 1083 (11th Cir. 2004)). "Merely negligent failure to protect" an inmate from an attack does not give rise to a § 1983 claim.   <u>Carter v. Galloway</u>, 352 F.3d 1346, 1350 (11th Cir. 2003).

As the Eleventh Circuit explained in <u>Marsh v. Butler County, Ala.</u>, 268 F.3d 1014, 1027 (11th Cir. 2001), <u>Farmer</u> sets out objective and subjective elements that must be shown in order to establish an Eighth Amendment violation. <u>Marsh</u>, 268 F.3d at 1028-29.   With regard to the objective elements, a prisoner must show that an objectively substantial risk of serious harm existed; and once it is shown that an official is aware of this objectively

substantial risk, the official must respond to this risk in an objectively unreasonable manner. Id. With regard to the subjective elements, a plaintiff must show that the defendant was aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists and that the prison official drew that inference. Id.; see also Purcell v. Toombs County, GA., 400 F.3d 1313, 1319-20; Carter, 352 F.3d at 1349. In other words, to show that an official had subjective knowledge, the court is to inquire whether the defendant was aware of a "particularized threat or fear felt by [the plaintiff]." Carter, 352 F.3d at 1350. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. Farmer, 511 U.S. at 838. Whether an official had requisite knowledge is a question of fact that may be demonstrated by circumstantial evidence. Id. at 842.

## V. Discussion

Defendants Johnson, Walker, Kraus, and Coniglio move for summary judgment, arguing that they are entitled to judgment as a matter of law as to the official capacity, the Eighth Amendment, the failure to protect, and failure to intervene claims. See generally Officers' Motion; Johnson Motion. Additionally, the Defendants assert that Plaintiff's request for declaratory or

injunctive relief must be dismissed as moot, and Plaintiff cannot recover compensatory or punitive damages for his de minimus injuries.  Officers' Motion at 14.  Id. at 14-15.  Defendant Johnson argues he is entitled to qualified immunity, and that the record does not establish a custom, policy, or practice to warrant liability against the Secretary of the Department of Corrections. Johnson Motion at 10, 14-17.

### Defendants Kraus, Coniglio, and Walker

The record shows the need for force without contradiction. The entire incident from the beginning of the escort to the end of the escort lasted approximately four minutes.  Plaintiff, a close management inmate, who has a history of violence while incarcerated, admits that he was "agitated" and that he did not want to be escorted by Defendant Kraus from his recreation cage. Lieutenant Walker warned Plaintiff that if he refused to be escorted, then force would be used on him.  The video footage does not contradict these facts and confirms that Plaintiff initially refused to be escorted by Kraus.  Plaintiff admits that at some point during the escort he turned his head and was "face-to-face" with Defendant Kraus.  Plaintiff also does "not recall" whether he used profanity at Officer Kraus.  The record shows that it was in this context that Defendant Kraus made a split-second decision to take the agitated, inmate, Plaintiff, who was face-to-face with Kraus and possible swearing at him, down to the ground.  Although

-23-

Plaintiff was wearing hand restraints, the restraints did not necessarily make Plaintiff less harmless. Thus, Kraus' reasonably perceived a threat and utilized two swift, movements to take Plaintiff down to the ground in order to protect himself, protect the other two guards, and maintain order at CCI.

Once Plaintiff was on the ground, Defendant Kraus submits that Plaintiff continued to resist. A review of the video footage in slide-by-slide viewing mode clearly reveals Plaintiff resisted Kraus, as Kraus attempted to secure Plaintiff on the ground and Coniglio responded to assist Kraus by holding Plaintiff's back and leg. At this point Plaintiff contends that he received "blows" from Defendant Kraus and was called a "baby raper." Defendants submit that Kraus did not hit Plaintiff, or call him any names. The video footage clearly shows Kraus' left arm held stationary over Plaintiff's back and shoulders. Indeed, the video footage does not provide an unobstructed view of Kraus' right side, but the lack of movement in Kraus' right arm, right shoulder, and back as reflected on the video does not contradict Defendants' version of the events. Moreover, during Plaintiff's deposition he was unable to describe how Kraus hit him, where he was hit, how hard he was hit, or what the hits felt like. In fact, Plaintiff acknowledged that he did not feel any pain from Kraus' purported blows. Also, Plaintiff fails to point to any evidence showing that he complained about any injury to his rib area during the post use of force

medical exam, or that he sought treatment for any injury to his
ribs at any point after the June 9, 2009 incident.  Besides
Plaintiff's allegations that he received "blows" from Kraus while
he was subdued on the ground, there is absolutely no other evidence
that Kraus hit, or punched Plaintiff in the ribs while Plaintiff
was secured on the ground.  At this stage of the proceedings the
Court does not make a credibility determination, or choose between
conflicting evidence, <u>Bozeman</u>, 422 F.3d at 1267,  but in this case
there is no evidence upon which a jury could rely to conclude that
Kraus hit Plaintiff after he was secured on the ground.

Defendant Coniglio responded to help Officer Kraus restrain
Plaintiff, who was resisting, on the ground.  The force Plaintiff
contends that Coniglio used against him was "pressure" that hurt
Plaintiff's leg.  The video footage confirms that Coniglio helped
Kraus restrain Plaintiff on the ground.  Coniglio's application of
pressure to Plaintiff's leg does not amount to excessive force in
violation of the Eighth Amendment.  Based on this record, the Court
cannot find that Kraus' movements effecting the take down of
Plaintiff to the ground or Coniglio's application of pressure to
Plaintiff's leg in order to secure him on the ground amounted to a
violation of Plaintiff's Eighth Amendment rights.  <u>See</u> <u>Bennett v.</u>
<u>Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)(finding it was not
unreasonable for a guard to  grab a prisoner by the throat and
shove him against the prison bars when the prisoner was failing to

follow the guard's instructions and yelling obscenities); <u>Cockrell</u>, 510 F.3d at 1311 (finding in similar circumstances that force sufficient to break bones did not violate the Eighth Amendment); <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."), <u>rev'd</u>, <u>Graham v. Connor</u>, 490 U.S. 386 (1989)(finding <u>Glick</u> test incompatible with Fourth Amendment analysis).

The record shows that Plaintiff was immediately escorted to the medical unit for a post use of force examination. The immediate transport of Plaintiff to medical shows that Lieutenant Walker and Officers Kraus and Coniglio tempered the severity of the use of force. The undisputed medical documents written contemporaneously with Plaintiff's medical examination evidence that Plaintiff sustained only scraped elbows and a scratch on his forearm. Plaintiff also complained of aggravated back pain to his pre-existing back condition. The record shows that Plaintiff's scraped elbows were treated with band-aides. The record does not indicate that Plaintiff made any requests for medical treatment for his back. Thus, the record shows that the extent of Plaintiff's injuries resulting from the use of force were minimal. The Court recognizes that a plaintiff need not suffer serious injuries to prevail on an excessive use of force claim, nonetheless, the Court considers the injuries in this case relevant to the determination

that the force used in this case was applied in a good faith effort to maintain or restore discipline, and was not done maliciously and sadistically to cause harm.

Plaintiff attributes liability on Defendant Lieutenant Walker, who was present at the time Kraus and Coniglio applied force on Plaintiff, for failure to intervene. Plaintiff also attributes liability on Walker for failing to direct another officer, instead of Kraus, to escort Plaintiff from recreation. If the Court finds a constitutional violation based on the excessive use of force, "'an officer who [was] present at the scene and who fail[ed] to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)(citing Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002))(other citations omitted). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000)(citing Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998)).

Considering the continuum of events and the short duration, the record illustrates that Kraus took Plaintiff to the ground and Coniglio assisted Kraus in securing Plaintiff on the ground, as a result of Plaintiff's resistance to authority and not for purposes of imposing "pain totally without penalogical justification."

Evans v. Dugger, 908 F.2d 801, 803 (11th Cir. 1990)(remaining citations omitted). Because the Court finds no constitutional violation, it is unnecessary to address the failure to intervene claim. See generally Velazquez, 484 F.3d at 1342 (explaining that Defendants may argue that excessive force was not used, thus no one failed to intervene). Lieutenant Walker's decision not to have Plaintiff escorted by a different guard, does not amount to constitutional liability based upon the facts in this case. In fact, Plaintiff's insistence that Walker have a different guard escort him instead of Kraus further evidences that Plaintiff was not complying with Walker's and Kraus' orders that Plaintiff leave the recreation cell for an escort by Officer Kraus. The record shows that Defendant Walker had no substantiated reason to believe that Officer Kraus posed a serious risk of harm to Plaintiff. For this Court to agree with Plaintiff and find that Lieutenant Walker should have directed a different officer to escort Plaintiff simply because Plaintiff did not want to be escorted by Kraus would allow Plaintiff to dictate prison staffing. The Court does not substitute its own judgment for that of prison administration. To the contrary, the Court defers to the judgment of prison officials on matters of internal administration and safety. Bell v. Wolfish, 441 U.S. 520, 548 (1979). Based on the foregoing, the Court finds no genuine issue of material fact remains and grants the Motion for

Summary Judgment filed on behalf of Defendants Walker, Kraus, and Coniglio.

**Defendant Warden Johnson**

Plaintiff attributes liability on Defendant Warden Johnson for failing to exercise "reasonable care" based on his knowledge of the previous attack by Officers Kraus and Coniglio in February. Complaint at 10. Plaintiff submits that he previously told Warden Johnson that he feared for his life and feared retaliation by Defendants Coniglio and Kraus, but his statements were ignored. Id. In support, Plaintiff references numerous inmate grievances that he addressed to Warden Johnson. Johnson Response at 3-5. Plaintiff also points out that the use of force reviews reflect that both Officers Kraus and Coniglio had eight uses of force reported in a one year time period. Doc. #114-2, Exh. H, Use of Force Reviews at 9-14. Additionally, Plaintiff refers the Court to a declaration from Ron McAndrew, a former warden for the Florida Department of Corrections, who avers that if he encountered the situation Warden Johnson encountered, he would have directed that the officer in question be removed from "inmate contact" until further notice. Doc. #114-1, Exh. I, Decl. McAndrew.[8]

---

[8]Notably, the Declaration of Warden McAndrew may be premised upon facts distinguishable from the instant case. It is unclear whether McAndrew thought that the officers threatened Plaintiff with physical harm, or whether he recognized it was inmates who had allegedly threatened Plaintiff with physical harm. The fact that inmates may or may not have threatened Plaintiff with physical harm
(continued...)

Defendant Johnson argues that he did not respond to any of Plaintiff's inmate grievances, which are attached to Plaintiff's Complaint, because his subordinates generally respond to inmate grievances. Johnson Motion at 3 (citing Doc. #1-2, Pl. Exh. C). Contrary to Plaintiff's claim that his grievances were ignored, Defendant Johnson explains what happens to inmate grievances once the institution receives them. Johnson Motion at 4 (citing Exh. G)(explaining levels of review established by the Department of Corrections for inmate grievances). Defendant Johnson submits that Plaintiff's grievances were either reviewed by his subordinates, or forwarded to the Inspector General's Office for investigation and review. Through this process, all of Plaintiff's allegations in his inmate grievances were determined to be unsubstantiated. Johnson Motion at 3. Defendant Johnson further acknowledges that he was responsible for reviewing all incident reports where force was used on an inmate, and creating a file to forward to the Inspector General's Office. Doc. #112-1, Exh. G, Decl. Johnson at 1. Defendant Johnson submits that he has no recollection of Plaintiff being in any danger from Officer Kraus or Coniglio between February 2009 and June 2009. Id. at 2.

At issue here is whether Defendant Johnson failed to protect Plaintiff from Officers Kraus and Coniglio, which would have

---

[8](...continued)
is irrelevant for purposes of this action.

averted the June 9 use of force.  The record shows Defendant Johnson encountered uncorroborated and unsubstantiated allegations that Plaintiff feared Officers Kraus and Coniglio because they "retaliated" against him, verbally harassed him, and told other inmates that he was a "baby raper."  Plaintiff acknowledges that Officers Kraus and Coniglio never threatened him with physical harm.  Thus, the June 9 use of force incident did not occur after Kraus and Coniglio threatened Plaintiff with physical harm. Instead, the record shows that the use of force incident occurred because Plaintiff did not cooperate with Lieutenant Walker and Officer Kraus during the escort.  Thus, Plaintiff has not shown that he faced an objectively substantial risk from Officers Kraus and Coniglio, nor an awareness of that risk on the part of Warden Johnson, which would have prevented the June 9 use of force incident from happening.

The record shows that Plaintiff's grievances concerning the February 3, 2009, and June 9, 2009 use of force incidents, were forwarded to the Inspector General's Office for review.  With respect to the use of force on February 3, 2009, the Inspector General's Office conducted an investigation and by February 9, 2009 had determined that Plaintiff's allegations were not supported by the evidence and were therefore not substantiated.  See Doc. #112-1, Exh. D at 48.  Likewise, the Inspector Generals's Office reviewed Plaintiff's allegations regarding the June 9, 2009

incident and by June 26, 2009, found them unsubstantiated.  Id. at 55-56.  The Court does not find that Warden Johnson's immediate commencement of the investigatory process into Plaintiff's accusations was an objectively unreasonable response.  Based on the record, the Court finds no rational trier of fact could find Defendant Johnson created, or was deliberately indifferent to, a substantial risk of serious harm to Plaintiff.  Because there are no genuine issues of material fact, Defendant Johnson's Motion is granted.

### Official Capacity Claims

To the extent that Plaintiff brought this action against the Defendants in their official capacity, the Court construed this action to be against the Secretary of the Florida Department of Corrections.  Supra at 4.  Defendant Johnson submits that an official capacity claim cannot be maintained because the Secretary of the Florida Department of Corrections has not been served, and even if the Secretary was on notice about the official capacity claim, Plaintiff has not shown that a custom or policy led to a violation of his constitutional rights.  Johnson Motion at 14.  In Response, Plaintiff refers the Court to the series of grievances Plaintiff filed from February 2, 2009, until the incident occurred on June 9, 2009, and argues that the Secretary was aware of the risk he faced at the hands of Officer Kraus and Coniglio.  Johnson Response at 16.

-32-

An official capacity claim against Defendant Johnson is the same as a claim against the entity that official represents, in this case the Florida Department of Corrections. See Kentucky v. Graham, 473 U.S. 159, 166-67 (1985)(citations omitted); Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)(per curiam). To the extent Plaintiff seeks to impose liability on the Department of Corrections by naming the Warden in his official capacities, the Complaint must allege that the Department of Corrections was the "moving force" behind the constitutional deprivation. Graham, 473 U.S. at 166. Specifically, the Florida Department of Corrections' "'policy or custom' must have played a part in the violation of the federal law." Id. at 166. Plaintiff does not identify any Department policy or custom that was a factor or contributed to his claim, nor does the record suggest any policy or custom. To the extent Plaintiff refers the Court to the numerous inmate grievances Plaintiff submitted for review, only the February 2009 incident involved the application of force on Plaintiff by Defendants Kraus and Coniglio. As discussed above, Plaintiff's grievances concerning the February 2009 incident were reviewed by the Inspector General's Office and deemed unsubstantiated. Moreover, an isolated, alleged incident of excessive force is insufficient to show a policy of allowing excessive force, or a policy of not investigating allegations of abuse. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). For these foregoing reasons, the Court

finds that there remains no question of material fact regarding the official capacity claims.  Accordingly, the Defendants are entitled to summary judgment on these claims.

ACCORDINGLY, it is hereby

**ORDERED:**

1.  The Amended Motion for Summary Judgment filed on behalf of Defendants Walker, Kraus, and Conigilio (Doc. #113) is **GRANTED.**

2.  The Amended Motion for Summary Judgment  filed on behalf of Defendant Johnson (Doc. #112) is **GRANTED.**

3.  The **Clerk of Court** shall terminate any pending motions and deadlines, including the Final Pretrial Conference, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Fort Myers, Florida, on this ___6th___ day of February, 2012.

JOHN E. STEELE
United States District Judge

SA: alj
Copies: All Parties of Record

-34-