IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

LESAMUEL PALMER,   Case No. 2:09-cv-604-FtM-29DNF
    Plaintiff,

v.

ADRO JOHNSON, et al.,
    Defendants.

## MOTION TO ALTER OR AMEND JUDGMENT

COMES NOW the Plaintiff, LESAMUEL PALMER, by and through the undersigned attorney, pursuant to Rule 59, Federal Rules of Civil Procedure, and moves this Honorable Court to Alter or Amend the Judgment for Defendants and against Plaintff and vacate the Order granting Defendants Summary Judgment, and would show as follows:

1. The Court granted Judgment to the Defendants based on its Order granting Summary Judgment to Defendants on these grounds:

    a. The Defendant Officers' use of force was necessary.

    b. Warden Johnson was not deliberately indifferent.

2. In its Order granting Summary Judgment, the Court erred as follows:

    a. The Court accepted Defendants version of disputed facts and took inferences in the light most favorable to Defendants.

    b. The Court misapprehended the standard for injury.

MEMORANDUM OF LAW

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure. The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158-159, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

**A. The Court Construes Facts and Inferences against Plaintiff**

  **1. Plaintiff's disciplinary record**

The Court early on considers, as part of the "undisputed facts," Plaintiff's disciplinary record while at the Florida Department of Corrections. The court mentions prominently an exhibit, document Doc. #112-1, Exhs. C, D; Exh.D at 51 (inmate John Doe reporting that Plaintiff told him he was the leader of a black gang mob and was planning an escape); Exh. D at 57 (reporting Plaintiff's use of profanity against Officer Schwartz and threatening the Officer, stating "I'm gonna get a hold of you

and kill you," "wish this window wasn't here. I'm going to have your job."); Doc. #114-1, Exhs. C, D1-D17.

It is hard to say what relevance these allegations have unless it is to take the inference that plaintiff is a dangerous inmate and that the corrections officers who used force against him would have *known* of the incident and that knowledge would have informed their apprehension about his turning to speak to another inmate and their decision to use force against him.

Here the court draws inferences in the most negative light to the Plaintiff. First of all, Exhibit D, document 112-1, at page 51 is a MINS report. The report itself shows that it was not sustained by the investigators. Likewise, exhibit D, document 112-1, at page 57, is another report of an allegation that was not sustained by investigators. In short, neither of the reported allegations that would tend to show that Mr. Palmer was a violent person were sustained by investigators. Further, there is no indication that the officer who used force against Mr. Palmer and the officer who stood by while it happened had any knowledge of the alleged incidents.

### 2. Events prior to the use of force

Next, the Court goes to the events just prior to the use of force. The version of events is highly deferential to the officer's accounts. In Plaintiff's version, he tried to explain his dilemma regarding Officer Kraus to Defendant Walker hours before the incident and Walker said he was not going to talk to Plaintiff and called him "a dumbass." Plaintiff raised the matter again a few minutes before the escort. Here, the

Court quotes the language from Mr. Palmer's deposition, saying that Lt. Walker came to "counsel" him. This seems to draw the inference that Mr. Palmer had done something to be counseled for. The full statement was that "Officer Walker came to the cage and everything to counsel me, to try to see what was going on." Doc. 116-2, page 8 (page 16 of the deposition).

Plaintiff Palmer goes on to explain Officer Kraus had lied in saying Plaintiff was "yelling on the rec yard." Id. Here, taking the inference in the best light for the Plaintiff, Lt. Walker had additional information Officer Kraus meant Plaintiff harm – that in addition to threatening Plaintiff, he was lying to create additional trouble for Plaintiff. Rather than take precautions to protect Plaintiff, the course suggested by Plaintiff's expert, long-time Florida Prison Warden Ron McAndrew (Doc. 114-2, page 15, Exhibit I), Defendant Walker told Plaintiff that Kraus was going to escort him and if Plaintiff didn't go with Kraus force was going to be used against him. One inference to be drawn from that is that Walker was sanctioning in advance the use of force by Kraus, despite his knowledge that Defendant Kraus had been threatening Plaintiff.

The Court also makes reference to an earlier incident in which Officers Kraus and Coniglio used force against Plaintiff after a reported fight between Plaintiff and his brother. Plaintiff claimed the use of chemicals was unnecessary and that Officer Coniglio twisted his arm and punched him during the escort after the use of force. The Court notes the Inspector General found the use of chemicals was appropriate on that occasion and declines to accept Plaintiff's version of events as true. The Court

does not address the incident involving Defendant Coniglio. Apparently no gain time was taken as a result of the disciplinary report that arose from the incident. Doc. 113-1, page 30, Disciplinary Report.

### 3. Interpretation of the video recording

In addressing the video recording, the Court notes that "the escort halted for approximately four seconds" before the use of force. (Doc. 130, p. 7). The Court notes in a footnote that when Plaintiff stops, "[t]he door leading into the institution is quite a distance away from where the escort halted and take down occurred. See Pl's Video. The distance is sufficient enough for other officers to walk in and out of the door without any hindrance by Plaintiff subdued on the ground by Officer Kraus." (Doc. 130, p. 11, n.6). Here, the Court seems to be drawing an inference about what distance from a door an inmate under escort is supposed to stop. The distance may seem excessive to the Court but there is no evidence whether, in fact, the distance is *supposed* to be "sufficient for other officers to walk in and out of the door without any hindrance by Plaintiff." In the absence of evidence to the contrary, the inference must be drawn in the Plaintiff's favor.[1]

The Court also mentions repeatedly that Plaintiff admitted he was "agitated." The fact that Plaintiff may have been agitated does not mean that he acted in a

---

[1] Here, it would have been helpful to the Court had attorney for the Plaintiff attached the second Ron McAndrew opinion, **Exhibit A**, stating that he had watched the video recording and found no basis for the use of force, to the response to Defendants' Motion for Summary Judgment.

particular way. It describes how he felt. At least that is the inference to be drawn in Plaintiff's favor. Plaintiff did not recall whether he used profanity. Plaintiff recalls that his comments to another inmate prior to the use of force were, "I'm cool, brother. They can't get to me." Doc. 116-2, page 14, Deposition of LeSamuel Palmer, page 22. That hardly amounts to threatening language but rather suggests that Mr. Palmer was not intending to let the Defendants' provocations entice him to act rashly.

The Court takes issue with the Plaintiff's allegations that Officer Kraus hit him and the Court states that Plaintiff cannot describe how Kraus hit him or on what side he was hit. The Court then goes on to quote Plaintiff as saying that Kraus hit him with his hand in his ribs on his right side. Doc. 130, page 12, n.7. The Court admits there is not a clear view of Defendant Kraus's right hand. The Court notes that the officers say they stopped using force when Plaintiff stopped resisting.[2]

### 4. Relevance of Defendant Kraus calling Plaintiff a "Baby Raper"

The Court seems to imply that the threatening behavior of Defendant Kraus in calling Mr. Palmer a "baby raper" may not be material to the issues raised in the Defendants' Motions for Summary Judgment. The Court states, summarizing from Doc. #116, Pl's Depo. at 10-11, that Defendant Kraus "never threatened [Palmer]

---

[2] Discerning the meaning of movements or lack thereof on a grainy, jerky, video is highly fact-driven and cannot be evaluated apart from the complex of events before and after. Issues such as whether short-arc blows would be visible in a partially-obscured view should be left to a finder of fact.

with physical harm."[3] According to Mr. Palmer, Officer Kraus did not threaten to inflict the injury himself but sought to get other inmates to inflict the injury. Doc. 116-2, page 38, Deposition of LeSamuel Palmer, page 46. Officer Kraus would make these statements in front of other inmates, encouraging them to physically attack Plaintiff. Plaintiff said Defendant Coniglio "was making the statements along with Officer Kraus." Doc. 116-2, page 3, Deposition of LeSamuel Palmer, page 11. On one occasion, after having spread the "baby raper" story among the inmates, Defendant Kraus went to Plaintiff's cell and said, "Do you want to go to rec? . . . I want you to go to rec today." Plaintiff said he construed that as a threat and did not go to rec that day. Doc. 116-2, page 38, Deposition of LeSamuel Palmer, page 46. The clarification renders the earlier statement far less important in analyzing the events. It cannot fairly be said that Kraus and Coniglio did not threaten Plaintiff. As Mr. Palmer explained:

> I had a couple of incidents with him. Basically he's making statements. He came up with the statement that basically was untrue. Everything that -- all their harassment and everything, I felt like something is going to go down. So I started complaining about it. So what happened? They did it. I felt like my life was in jeopardy. A person ain't actually got to say, "I'm going to shoot you," or, "I'm going to kill you," for you to actually know your life in jeopardy or not.

Doc. 116-2, page 4, Deposition of LeSamuel Palmer, page 12.

If in fact, the threats were made, as the Court must assume for purposes of summary judgment, and made again in the context of the use of force, a reasonable

---

[3] The statement by Mr. Palmer in deposition that Officer Kraus had not "threatened" him was later in the deposition clarified to mean that Officer Kraus had not threatened to inflict the injury himself but was seeking to get other inmates to inflict the injury. Doc. 116-2, page 38, Deposition of LeSamuel Palmer, page 46.

jury could conclude that the purpose of the use of force was not to deal with a threat by Mr. Palmer, but to finally do what Defendant Kraus was not able to get other inmates to do, to inflict physical harm on Plaintiff, not for a legitimate penological purpose, but "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986). This is an issue for a jury to consider in the context of the words and actions before and after the silent tableau of the use of force video recording.

### 5. Defendant Walker's Failure to Intervene

The Court notes that Plaintiff complained to Lt. Walker earlier the day of the use of force that he was afraid of Officer Kraus and that Plaintiff repeated his concerns just before the use of force. Plaintiff said that the first time that day Walker called him a "dumbass" and refused to talk to Plaintiff because he was a "dumbass." Doc. 116-2, page 4, Deposition of LeSamuel Palmer, page 12. On the second occasion, Walker told Plaintiff that if he didn't submit to Officer Kraus's escort, force would be used against him. The Court finds relevance in the fact that Plaintiff briefly balked at being escorted by Officer Kraus but there is no indication that his delay was any longer than necessary to voice his fears at being escorted by Officer Kraus.

The Court notes that Lt. Walker "did not see either correctional officer take any action he felt was excessive." Doc. 130, page 14. However as has been noted, Lt. Walker was notified twice that Plaintiff expected harm from Officer Kraus, refused to talk to Plaintiff because Plaintiff was a "dumbass," and heard that Officer Kraus had

lied about Plaintiff speaking loudly in the rec area. If, in fact, a reasonable jury could find that Plaintiff stopped an appropriate distance from the door, so officers could come and go while Plaintiff waited for the door to be opened, and that his words and body language did not appear to threaten Officer Kraus, then a jury could find the force excessive and Lt. Walker's failure to intervene a constitutional tort.

### B. Deliberate Indifference as to Warden Johnson

The Court notes that Warden Johnson had subordinates handle Plaintiff's complaints that he feared injury or death from Officer Kraus and, had he seen any record verifying Plaintiff's concerns, he would have taken action. Plaintiff's corrections expert, Ron McAndrew, took issue with Warden Johnson's response, outlining the actions he would consider reasonable and appropriate to address the risk of harm:

a. Order an investigation (to document my actions and the possible actions of the officer)

b. I'd immediately remove the officer from 'inmate contact' and assign him/her to an area such as the control room with written instructions that he would not be allowed inmate contact until further notice. I'd keep him/her away from inmates until the investigation was completed.

c. I'd have the inmate receiving the 'threats' placed into protective confinement pending investigation of the allegations.

d. If the investigation proved that the officer did in fact make such a statement(s) and that the inmate received threats I'd take appropriate

administrative disciplinary actions. The level of the action would depend on the full content of the investigation………any possible past discipline (especially if it involved same offense)… status of officer (probationary or career service). Such discipline could be as serious as dismissal.

When persons with the same professional background and expertise are at odds with each other over what would have been an appropriate professional response to the allegations by Plaintiff, it should fall to a jury to draw the conclusion.

### C. The Court Erred in Finding Plaintiff Suffered "No Injury."

Courts have concluded that for purposes of an Eighth Amendment excessive force injury, "the physical injury must be more than *de minimis*, but need not be significant." *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir.1999), *vacated, in part, on other grounds*, 216 F.3d 970 (11th Cir.2000) (en banc ). *Johnson v. Breeden*, 280 F.3d 1308, 1312, 1321 (11th Cir.2002) (a head injury that caused swelling and seizure, along with lacerations and contusions, constituted more than *de minimis* injury).

In *Wilkins v. Gaddy*, the U.S. Supreme Court rejected the idea that "significant injury" is a threshold requirement for an excessive force claim. The Court found that:

> The "core judicial inquiry," was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995; see also Whitley v. Albers, 475 U.S. 312, 319-321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some

> arbitrary quantity of injury." Hudson, 503 U.S. at 9, 112 S.Ct. 995; see also id., at 13-14, 112 S.Ct. 995 (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").

*Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010).

Here, Plaintiff suffered an injury that required, and was given, medical treatment, including the application of antiseptic and bandages. He also received an injury to his back that has continued to affect him. The Court mentions that Plaintiff "acknowledges he suffers from a pre-existing back condition." Doc. 130, page 8. Under Florida law, a defendant is liable for aggravation of an existing injury. *Thomason v. Gordon*, 782 So.2d 896 (Fla. 5th DCA 2001). Although it could be argued that the former injury does not constitute a compensable injury under the Prison Litigation Reform Act, it is not a basis for summary judgment.

### D. Conclusion

The Court properly notes that "prison officials have a duty . . . to protect prisoners from violence . . . . ." citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The Court also properly states that "[w]hen officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection." citing *Hopkins v. Britton*, 742 F.2d 1308, 1310 (11th Cir. 1984).The Court also concedes that where there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable

inferences" must be drawn in favor of the non-moving party." *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Shotz v. City of Plantation*, Fl., 344 F.3d 1161, 1164 (11th Cir. 2003). However, the Court goes on to say:

> A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

It simply cannot be said that Plaintiff's allegations, as documented above, are "implausible" or that they are "conclusory allegations based on subjective beliefs," or "blatantly contradicted by the record." All that Plaintiff has alleged may plausibly be true. Certainly it is plausible that corrections officers might be enraged by what they believe is the offense for which the inmate is serving time, might stalk an inmate and importune other inmates to do bodily harm to the inmate, and failing that goal, might connive to find an opportunity to escort the inmate, based on a lie that the inmate was misbehaving, and use the escort as an opportunity to slam the inmate to the pavement.

Certainly it is plausible that an unsympathetic superior officer, who disdains the inmate as a "dumbass" might turn a deaf ear and a blind eye to the expressed concerns of the inmate that the officers under that superior officer's supervision mean him serious harm and fail to take precautions to protect him from such harm and further stand by while unprovoked violence is done to the inmate.

The testimony of the Plaintiff's corrections expert might plausibly express an accurate representation of the appropriate standards of professionalism that the Warden should have followed to abate the risk of the kind of harm Plaintiff suffered.

The Court has merely adopted the facts and taken the inferences that are favorable to the Defendants rather than the Plaintiff. And that, it may not do.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court Alter or Amend the Judgment, withdrawing Judgment for the Defendants and Vacating the Order granting Summary Judgment.

> Respectfully submitted,
>
> *s/James Cook*
> JAMES V. COOK
> Florida Bar Number 0966843
> 314 West Jefferson Street
> Tallahassee, Florida 32301
> (850) 222-8080; 561-0836 fax

I CERTIFY the foregoing was filed electronically on 3/5/12 and that the person noted below is registered to be notified by the CM/ECF electronic mail system:

Lance Eric Neff
Office of the Attorney General
The Capitol, PL 01
Tallahassee, FL 32399-1050
Lance.neff@myfloridalegal.com

> *s/James Cook*
> JAMES V. COOK

<div style="border: 1px solid red; color: red; display: inline-block; padding: 4px;">EXHIBIT A</div>

<div style="text-align: center;">
Ron McAndrew<br>
20390 The Granada<br>
Dunnellon, FL 34432-6082<br>
Prison & Jail Consultant<br>
www.RonMcAndrew.com<br>
(352) 465 5919
</div>

**Ref: Lesamuel Palmer, Plaintiff, v. Adro Johnson, et al, Defendants, in The United States District Court for The Middle District of Florida, Ft. Myers Division, Case No. 2:09-cv-604-FtM-29DNF**

I have been retained by Attorney James V. Cook, Esq., Law Office of James Cook, PO Box 10021, Tallahassee, FL 32302-0021, Tel: (850) 222-8080 to offer my professional opinion regarding Civil File No. **2:09-cv-604-FtM-29DNF**
<u>**CORRECTED SUBMISSION JULY 22, 2011**</u>

**I have reviewed the following relative to Civil Action No. Civil File 2:09-cv-604-FtM-29DNF**
- **Inmate Grievance Summary, Lesamuel Palmer, DC# L41847**
- **Lawsuit Complaint**
- **Total of 3 videos surrounding incident**
- **Motion for Summary Judgment Kraus Walker**
- **Order on Motion for Summary Judgment by Defendants**
- **Johnson Motion for Summary Judgment**
- **Johnson Motion for Summary Judgment Exhibits**
- **Motion for Summary Judgment Johnson Response**
- **Motion for Summary Judgment Johnson Response exhibits 01**
- **Motion for Summary Judgment Johnson Response exhibits 02**
- **Adro Johnson personnel files**
- **Deposition of LeSamuel Palmer**
- **Palmer Pretrial Narrative Statement**
- **Palmer Grievance appeals**
- **Palmer Use of force files**
- **Theresa Porter personnel files**
- **Adro Johnson CJST files**
- **Johnson, Adro discipline files**
- **Miroslaw Kwasnik personnel files**
- **Michael Gonnelly personnel files**
- **G Dorm Housing log**
- **Overall Inmate Record of McGee, Clayton**
- **Penny Mann personnel files**
- **Erich Hummel personnel files**
- **Stephen Coniglio personnel files**

- **Michael Kraus personnel files**
- **Reassignments by Walter McNeil as of 06**
- **USDOJ Prison Rape Elimination Act Agenda 080312**
- **0506-Master Training Plan**
- **0607-Master Training Plan**
- **0708-Master Training Plan**
- **0809-Master Training Plan**
- **0910-Master Training Plan**
- **1011-Master Training Plan**
- **Floor plan - G Dorm, Quad 1**
- **Daily Records of Special Housing, with addenda**
- **STARS Training Johnson-Walker-Kraus**
- **Training Aaron Walker**
- **Training Adro Johnson**
- **Training Michael Kraus**
- **Training Stephen Coniglio**
- **Use of Force Report 2009 0609**
- **Use of Force Instructor Guide - 2011**
- **Use of Force Instructor Guide - 6-30-08**

My professional opinions are based on my background, professional experience, education and review of the documents listed above.

A total overview of those I have consulted with and/or testified, fee schedule and a complete résumé are attached as appendix A, B & C.

I wore a prison officer uniform and climbed through the ranks of basic recruit correctional officer, certified correctional officer, sergeant, lieutenant, captain, investigative lieutenant, correctional inspector and major at three major prisons in Florida for a period of 9.5 of my 23 years of correctional employment; performing all 'gut level' assignments in open population, administrative confinement, protective confinement and disciplinary confinement, food service, control room assignments, mail room officer, arsenal sergeant, visitation officer, visitation sergeant, inside and outside security officer, receiving officer, work squad supervisor, transfer officer, property room officer, classification review team officer, hospital officer, perimeter security officer, medical officer, psychiatric observation officer, medical escort officer, investigator; escape and recapture officer; confrontation team member (riot team); training officer and orientation officer; Inspector of all institutional criminal, administrative and accident matters. During my four years as an investigator and inspector, I testified some 15 times in the $7_{th}$ Judicial Circuit of Daytona Beach, FL on cases that I had filed with the State Attorney's Office relative to investigations that I had conducted.

Following my experience while in uniform and in the investigative ranks, I was promoted

to Assistant Warden at a new (and not yet opened) close-custody prison reception center (CFRC) in Orlando, FL. There, I held the duties of Assistant Warden I, Assistant Warden II of Operations and Assistant Warden II of East Unit. As the Assistant Warden, I worked directly under the Warden, responsible for the operations of the entire institution to include Security, Reception & Processing, Classification, Maintenance, Construction, Personnel, Food Service, Medical, Dental, Psychology, Psychiatric Services, Chaplaincy and ACA coordinator. As Asst. Warden II, my responsibilities were much the same but with shared duties of another Assist. Warden II. CFRC became one of the largest prisons in Florida, with three units and approximately 3000 inmates. In 1992, I was appointed as a new Warden of a new close-custody prison in Wewahitchka, FL with the responsibility of opening, staffing, securing, the receiving of an initial inmate population of 1300 inmates, the construction of a 1400 man annex to the prison under commercial contract with the use of inmate labor, developing new relations with the community at large and getting a 'buy in' from the neighboring communities that had previously rejected the idea of a prison in the area. Within one year this prison absorbed Gulf Work Camp (25 miles to the south) and Franklin Work Camp (71 miles to the east) that raised the population to 3250 inmates by 1995, making it the largest prison in Florida.

In 1996, I was appointed as the Warden of Florida State Prison in Starke (Raiford), Florida. Florida State Prison has Florida's death row and, at the time, the electric chair. My duties included complete operational control of the entire prison to include an annex, the "O" unit, a farming program where most of the prison's vegetables were grown, supervision of 3 Assistant Wardens, supervision of approximately 700 employees, the custody and care of 1450 maximum and close custody inmates, and carrying out executions as directed by the Governor of Florida. During my tenure as Warden of Florida State Prison, I testified approximately 3 times in Federal Court on matters related to the use of the electric chair as a method of carrying out executions. My testimony was on behalf of the State of Florida. At least twice during this tenure, I was selected to testify before the State of Florida Legislature, Corrections Committee, on issues related to the death penalty and executions.

In 1998, I was appointed as the Warden of Central Florida Reception Center, the largest prison in Florida. It had 3300 inmates stemming from 4 separate units that included a reception and diagnostic center for all new commitments from the central Florida region. It also had the first of its kind in the world, an HIV-AIDS treatment and research unit where inmates on a voluntary basis received treatment under a study conducted by one of the top HIV-AIDS scientists in the world, Dr. Margaret Fischl. I took a hands-on rein of the activities of this unit and saw that this research study was given every possible logistic support and that the program was allowed to be monitored and to grow at Dr. Fischl and Dr. Diane Rechtine's (Prison Chief Health Officer) pace of study. The study from this unit is used throughout the world today in terms of HIV-AIDS treatment. Additionally, my supervision included the East Unit of 1013 inmates and a work release center of approximately 175 inmates.

In 2001, I retired from the State of Florida. Five days into my retirement, I was called by the Orange County Mayor and asked to take over the direction of the $13_{th}$ largest county jail in the United States, Orange County Jail, FL with 1761 staff and over 4400 inmates,

3

an operating budget of $110,000,000 and construction budget of $114,000,000. I declined, explaining that I had just retired and needed time to develop my newest career – politics and consulting. Later that week, I was asked to take charge as the Director of Orange County Jail until a national search could be conducted for a replacement. I agreed. Almost one year later, the new Director was hired and I went back into semi-retirement.

## RATE OF PAY

My rate of pay is $100.00 an hour to consult and $850.00 per day for deposition or court room testimony-or any fraction thereof, reasonable travel costs, meals and lodging.

## RESERVED PRELIMINARY OPINION BASED ON MATERIAL REVIEWED AS OF July 13, 2011
**Additional comments may be forthcoming pending possible new material**

This is a case involving a prisoner who while incarcerated at Charlotte Correctional Institution, Florida, was the victim of unauthorized use of force (assault) by uniformed correctional staff while fully and mechanically restrained with handcuffs behind the back.

As a warden of three of Florida's largest prisons (certainly in size, scope, budget and difficulty to manage), having served in all uniformed ranks in a total of eight prisons, and as the director of the nation's 13th largest jail (Orange County Jail), I can say without hesitation that unnecessary-unauthorized use of force should never be used on offenders.

Had I been the warden of Charlotte Correctional Institution and aware that unnecessary-unauthorized use of force, to wit, assault, had occurred on June 9, 2009 I would have initiated immediate disciplinary action against those involved to possibly include their dismissal and/or submission of criminal charges to the state attorney for assault.

It is my professional opinion from hands on experience that the power of intimidation by correctional staff over offenders is dauntingly fearsome. An enormous amount of power over the lives of others is entrusted to those carrying the authority in places of incarceration. While 'authority' is necessary for correctional staff to carry out daily duties wardens must realize that malicious acts do occur against to those entrusted with the care and custody at times. This was a recognized correctional fact throughout my prison and jail career, a fact not lightly taken at any level of my responsibilities.

Those in leadership positions should understand that an intimidating factor does in fact play a part in the makeup of correctional settings and strictly supervise accordingly. Leaders and staff must reckon with the fact that predators infiltrating personnel ranks is always a viable possibility and to keep an ear to the ground for assurance that those

entrusted for care, custody and rehabilitation are safe from such possible aggression. This is paramount in places of incarceration and commonly recognized by trained correctional staff.

Numerous times in my own correctional career as a uniformed staff member, investigator, inspector or senior management member, I investigated, filed criminal charges on, or terminated the employment of predator staff members who had abused offenders. In my career as a consultant I have worked numerous cases involving assaultive situations of state prisoners by staff, again with the use of power, physical actions and intimidation.

Proactiveness by wardens and senior uniformed staff toward the prevention of abuse by staff is a recognized correctional need and must be consistently enforced.

It is further my professional opinion that:

- Considering the number of complaints and grievances against, and uses of force by officers Michael Kraus and Stephen Coniglio that related directly to the plaintiff, correctional leadership to include the warden showed deliberate indifference in terms of following correctional standards and policies to protect those entrusted to their care and custody.
- Again, based on the enormous amount of information relative to the possible short comings of officers Kraus and Coniglio, the warden failed to order and/or make a special request for a 'through' investigation by the Inspector General's Office on numerous allegations.
- Warden Johnson clearly states that "*If I had been given verifiable information – from any of the various levels of review – that Officer Kraus or Officer Coniglio may have been a threat to inmate Palmer, I would have taken the appropriate steps to ensure the safety and security of the inmate.*" It is my firm professional opinion that the inmate requests, inmate grievances, uses of force, investigations and confinement records were strong indicators that Officers Kraus and Coniglio were not effectively supervising Mr. Palmer, and thus a strong reason to separate these staff members from the offender. This is commonly recognized in correctional settings and an effective work tool in maintaining a secure institution. <u>(There is a distinct difference between an offender who makes a single complaint relative to an officer's behavior and a continuous blitz of complaints and pleas to the warden indicating fear for one's life)</u> Warden Johnson openly admits in his statement that he was "aware" of Offender Palmer's dilemma but failed to resolve the issue.
- That correctional professionals know well the dangers that loom for inmates being openly referred to as "baby rapists." When such accusations are made by uniformed staff the dangers would be considered even more serious. This was clearly outlined in Palmer's grievances.
- That instead of recognizing there was a libelous situation developing at the hands of Kraus and Coniglio and moving these officers to an area away from the plaintiff, the opposite was allowed. Mr. Palmer was moved to "G" Dorm only to

5

have Kraus and Coniglio reassigned to "G" Dorm. This purposeful move only aggravated the depth of an already difficult situation for both the correctional institution and Mr. Palmer.

- That in viewing the video of the circumstances involving this reported use of force, it is my firm professional opinion that Offender Palmer was fully and mechanically restrained with handcuffs at the time he was 'body slammed' to the concrete floor and then laid upon by a uniformed officer.
- That further, Mr. Palmer did absolutely nothing visible on camera that would justify a use of force by Officers Kraus and Coniglio.
- That Warden Johnson confirms that he didn't see Palmer "pull away" from Kraus, a claim made by Kraus in his report of force used.
- That the fact that there was no disciplinary report processed indicates that there was recognition by the officers and authorities reviewing their reports that no discipline would have been justified in this case.
- That Lieutenant Walker stood immediately in front of the scene of this unauthorized use of force and did nothing to intervene to prevent the impermissible use of force gives evidence of a lack of leadership responsibility.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 22nd day of July 2011.

*Ronald McAndrew*

Ronald (Ron) D. McAndrew

6